We will move to the next case, Hubbard v. Bayer Healthcare Pharmaceutical. We'll hear first from Mr. Walbert for the appellant. Thank you very much, Your Honor. May it please the court. This is David Walbert on behalf of the appellants, Karen Hubbard and Michael Hubbard. Karen Hubbard, when she was 41 years old, suffered a massive cerebral hemorrhage resulting from a venous sinus thrombosis. In common parlance, that's a blood clot to the brain. As a result of that cerebral hemorrhage, she suffered catastrophic injuries. Specifically, mentally, on the mental side, she was effectively destroyed to the point where she had to start doing rehabilitation, beginning at a kindergarten level, learning letters, words, how to spell dog, how to spell cat, numbers, identifying numbers, and so on. And then she was making progress, but plateaued at a third grade level in terms of her mental acuity. On the physical side, it was very similar. After working really hard, and really her husband, Mike, has been a saint during all this, and working with her and the caring he's shown, she could now stumble forward a few steps with Michael helping her along the way. All of this now comes after taking the birth control pills that are at issue in this case. And by way of background, Karen Hubbard had been taking birth control pills since 1988, so 24 years at the time of this cerebral hemorrhage and the time of the clot that caused it. The birth control pills, as we talk in our brief, of course, are called combined oral contraceptives. What's combined is that there's a combination of estrogen and progestogen in the pills. There's both of the different hormonal components in order to achieve the purpose of the birth control pill. Only twice in that 24-year period did Karen Hubbard stop taking birth control pills. First time was in order to get pregnant, and she gave birth to her daughter, Jessica, who was 15 years old at the time of this incident. Second time, a few years later, she gave birth to her son, Jake, and he was 12 years old at this time. In all those years, the 24 years prior to this incident, she had never had any problem with birth control pills, never had a side effect, never had a difficulty. Yes. Mr. Wolbert, the facts here are surely concerning, whatever the legal outcome, but if I could interrupt you and ask you about one of the legal issues that we're considering. In 2010, we've had a deep that if the warning is inadequate or merely presumed to be, as I think perhaps is the case here, the plaintiff must demonstrate that the deficient warning proximately caused the alleged injury to prevail. Why, in your view, does that not answer the question that we face of who bears the burden of proving proximate causation? I'm not sure I quite understood your question, Your Honor, but if the question is, there's a presumption in favor of causation with a proper label, there would have been a different prescription given. What is the consequence of that presumption? Did I catch you on it? No. In 2010, in the Dietz case, our court said that if a warning is inadequate or presumed to be inadequate, then the plaintiff must demonstrate that the deficient warning proximately caused the injury. How, in your view, do you get around that case law that says that the burden is on the plaintiff to demonstrate proximate cause? Number one, Dietz is the perfect case to show exactly where the district court and Bayer is wrong in this case, because the evidence in Dietz was unequivocal and undisputed, that there was no other treatment that was available. The doctor in Dietz testified that, no matter what I would have known in a different warning label, the warning label here, that there was only one option I had for this particular patient, which was Paxil. That's what he gave me. He said, no matter what the warning label would have been, I would have done the same thing. So when you look at the balance of risk and benefit, the doctor says, no matter what I would have known about a greater risk, I had no choice in this case. I would have done the same thing. Absolutely inapplicable, factually, to this case. Number one, there is, of course, your Honor is right about the Dietz law, but there's also a presumption under Georgia law that is, if the warning label was deficient, and in this case, it's taken as a given that it was, purpose of the summary judge motion and on appeal, there's a presumption of causation in terms of it making a difference about what drug would have been prescribed. What case can you cite under Georgia law that establishes that presumption? I think the Hawkins case is the one that comes to mind, and I think this court reiterated that in its Ellis case, and goes back to the Reese case in the Fifth Circuit was one that talked about it, then a doctor said it with approval in that analysis by the Hawkins case. The Porter case, of course, is the case from the district court, Northern District, where Judge Forrester went into this issue at great length and talked about the fact that there's only two options, either the presumption that exists for causation is rebuttable or it's conclusive. He concludes that there is no decision in Georgia which says it's conclusive or rebuttable. Judge Forrester said, I think it's going to be, it's rebuttable in Georgia. That was the basis. That was his decision, and that case was affirmed by this court. Everywhere in the country, there's a presumption. The only question is whether it's a rebuttable presumption or not. Let me ask you a question. Yes, sir. In the Smith-Klein-Beecham case, did we ever say that if the warning was inadequate, there was a rebuttable presumption of proximate cause? In which case, your honor, in Deet's? In Deet's, yes. Well, no, I don't... Okay. Bear with me. Bear with me. Yes, sir. We all agree that in Deet's, warning inadequate. Question, did the Deet's court say that if a warning is inadequate and everybody agrees and stipulates that it is in the Hubbard's case, that there would be a rebuttable presumption of proximate cause? It didn't need to because in Deet's, the evidence was undisputed and conclusive that it would have made no difference. In Deet's, the doctor testified unequivocally. No matter what, I would have done exactly the same thing. The only reason I raise the question is because Deet's said that, and again, it's even there where the warning was presumed to be inadequate. Quote, the plaintiff must demonstrate that the sufficient warning proximately caused the alleged injury to prevail. There was no reference to a rebuttable presumption in that case. The problem that I have is when I looked at Georgia law, I couldn't find any case that said or suggested that there was a rebuttable presumption. I can find it in law elsewhere in other jurisdictions, but of course, I'm eerie bound by the law of Georgia. If Georgia has never postulated a rebuttable presumption, and we made no reference to it in Deet's, I would be riding on a clean slate to say there is a rebuttable presumption, wouldn't I? No, because the Porter decision in the Northern District of Georgia goes into this in detail, and the 11th Circuit has already affirmed that ruling. Again, if you look at the Hawkins case very closely, that's in there. Again, in this case, your honor, we don't even need to get to that because on summary judgment, Bayer's got to show that there's no evidence on which a jury could find or infer that there wouldn't have been a rebuttal. In this case, we have tons of evidence that it would have been different. Let me just cite three pieces of evidence why summary judgment is inappropriate with or without a presumption. Dr. Rowley testifies unequivocally that I make my prescription decisions based on a balance of risk and reward. With this drug, there's no question that there's an enhanced risk, and there's also no question that there's no enhanced benefit by Bayer's over the earlier contraceptives. They had a lesser risk by a factor of two to three of having a stroke of this order and a clot that can cause this stroke. Under Dr. Rowley's own testimony, using the balance of risk and benefit, his testimony, had he been fully informed in 2011, in December 2011, when he gave his prescription, there would have been a different prescription. That's the evidence in this case. The district court really ignored that particular feature. Another thing that Dr. Rowley testified to unequivocally is he did, in fact, change his prescription testimony with regard to what he told patients after the April 2012 label change. He said, from his testimony, I'll quote it, if I prescribe Bayer's, this is afterwards, I do inform the patient of a higher risk of clotting versus some other types of birth control pills. He went on, and that's at page 36 of his deposition, he went on to testify that he informed the patient of that new information because of what became available to him in 2012. One of the things he says specifically about that is that, because in 2012 he learned that Prosperinone, Bayer Prosperinone-containing drugs, birth control pills, had a higher risk of causing the clot, which causes the stroke. Let me back to the counsel, understand something about the counseling. Did Dr. Rowley counsel Ms. Hubbard, or was she counseled by a physician's assistant or a nurse? Nurse's assistant in this instance, Your Honor. Dr. Rowley testifies, this is the practice under me, and that's what the deposition testifies about, about what would happen under him. Did the nurse say what counsel she gave to Ms. Hubbard? That's not specifically in this record other than through the testimony of Dr. Rowley testifying about the practice. I understand what Rowley said. I'm asking whether the nurse was deposed or submitted an affidavit indicating what counsel she may have given Ms. Hubbard. I don't believe. She wasn't deposed. My understanding was she had no specific recollection at all of the situation. You said there were three pieces of evidence. First, balance of risk. Second, that Rowley changed how he counseled his patients, although he didn't counsel her at all, apparently only would have consumably instructed the nurse to counsel. That's correct. He testified that was the practice under him, and he is, of course, the prescribing physician, so he is absolutely responsible for having done the prescription, whether that's directly by him through consultation or whether that is by somebody under him. That's his legal responsibility since he signed that prescription. What was the third piece of evidence? The third thing is the undisputed objective features in the practice, which is, as of right after the April 2012 warning, the BIAS level of prescriptions in the office crashes. It goes way down to the point where soon thereafter, as he testified his word, he only occasionally, quote, unquote, prescribed BIAS after the fact. Now, why did he never prescribe? The only reason he might have occasionally done it, maybe some patient—this is not Karen Hubbard—but maybe some patient had a reaction to another birth control pill, and that's why he would have given BIAS. Mr. Waller, isn't it—and please correct me if I'm wrong—I understood the testimony today that Dr. Rowley was—he attributes the drop in prescriptions for BIAS to patient requests for an alternative medicine, not that he viewed the warning as something that would counsel him not to recommend it. Is that not accurate? Well, it is one interpretation of his testimony, but let me be real clear about this, Doctor, because he also—Doctor, excuse me, Your Honor—Dr. Rowley also testifies that his says it's a joint decision between them, and if a patient comes in knowing independently that there's a higher risk, that's going to be part of the collaborative process. But to say that this eliminates the significance of the testimony when he testifies that it's collaborative, sure, the patient ultimately makes a decision on this. If the doctor says, look, here's birth control pill one, it has this risk. Here's birth control pill, it has twice as much risk, and there's really no additional benefit in your case, then the patient is going to say, no. What about Ms. Hubbard's testimony—I'm sorry, this is Judge Grant—what about Ms. Hubbard's testimony that for her, the prescription decision was not collaborative, that she went along with whatever her doctor prescribed? Well, she didn't say it wasn't collaborative. Now, remember, this is a woman, and she's got a third-grade functioning capacity at the time of her deposition, and she did say—and I think it says—but she didn't say it wasn't asked by defense counsel, if Dr. Rowley had told you that Baez had twice as much risk or three times as much risk of stroke as his other pill but had no additional benefit, what would you have done? Well, first of all, she probably couldn't today testify what she would have done back then because of her mental acuity, but she's not going to say, gee, I would have taken the higher-risk pill regardless. I mean, it's inconceivable. If she's relying on him and he's fully informed, that's the kind of conversation that would have happened, and beyond a shadow of a doubt—and again, it's not our duty to prove for certain. We only have to prove that—we only have to show in the record there's sufficient evidence upon which a jury could have found that there is causation and there would have been a different prescription, and we only have to show that there's enough evidence from which a jury could have inferred it. All these areas of testimony we're talking about, the risk-benefit analysis that Dr. Rowley says he always uses, the decrease in prescriptions falling off the chart, Baez disappearing to being only occasionally used when a particular patient needs it, and his explicit testimony that he changed his advice to patients—and that, again, so if she says she does what the man says and he says, I changed my advice to patients based on the April 2012 warning, that's compelling evidence that we can argue to a jury, ladies and gentlemen, this would have been a different prescription had he known what he later found out in April 2012. That's his testimony. You've heard it as a video deposition, so let's assume it's exactly the same testimony at trial. We can argue that to the jury. That's right. The summary judgment order here, which you, your honors, know was not the district court's independent summary judgment order. District court took Baer's proposed order verbatim. That summary judgment order is closing argument of Baer. Baer has some interesting points in the deposition talking out this and that. If you take those, Baer can make those points as a closing argument to a jury. I'll beg the court for a minute of rebuttal when I get to that point. We'll give you your full five minutes. Thank you. Thank you very much, your honor. Ms. Swift, you are up. May it please the court, this is Kate Swift on behalf of Baer, the appellee. The undisputed evidence in this case shows that Dr. Rowley had actual knowledge of the risks of VA as when he prescribed it for the plaintiff and that he kept prescribing it after Baer changed its label in 2012 to add additional risk information. That evidence breaks the causal chain. In an attempt to withstand summary judgment, the plaintiffs speculate about what Dr. Rowley might have said in response to questions that they chose not to ask him. They offer no evidence from which a jury could conclude that a different warning from Baer would have led Dr. Rowley to make a different prescribing decision. The plaintiffs therefore cannot show that Baer's failure to warn was a proximate cause of the plaintiff's injury. I'd like to focus a bit on the testimony from Dr. Rowley that required summary judgment and then I'd like to address a few of the points raised with the plaintiffs this morning in their argument. The transcript from Dr. Rowley's deposition is reproduced in full in Baer's supplemental appendix and it also appears in the record below at document 58-1. Dr. Rowley's testimony about his knowledge of the risks at the time of the prescription and about his prescribing practices after the 2012 label change, all of that testimony is undisputed and it's unequivocal. First, with from Baer, Dr. Rowley testified that he has known since the 1970s that all birth control pills increase the risk of venous blood clots. That testimony is at page 30 of his deposition. At the time of the plaintiff's prescription, Dr. Rowley knew that Baer might have a higher risk. He was asked at page 97 of his transcript, were you aware of the possibility of an increased risk of blood clots from pills like Baer's in May of 2011? Answer, yes. At that point, he knew about a variety of studies finding a small increased risk from pills like Baer's. He knew about two studies that were warned about in the 2010 Baer's label. That testimony is at pages 92 and 93 of his deposition and he also knew about later studies published throughout 2011. The FDA also publicized those throughout 2011. At page 112 of his transcript, Dr. Rowley testified that those later studies were, quote, no different from previous studies showing a slight increased risk. Those later studies found a two to three-fold higher risk from pills that were similar to Baer's and those were the same studies that Baer added to its label in 2012. The undisputed testimony about Dr. Rowley's knowledge shows that he was aware of those studies and the risks that appeared in the 2012 label. He knew that information by December of 2011 when he prescribed Baer's to the plaintiff. Turning to Dr. Rowley's prescribing practices after the 2012 label change, he testified unequivocally that he continued prescribing Baer's. That testimony is at page 16. He also testified that he continued to believe that the benefits of Baer's outweighed the risks in patients who had already been taking it for some time with no problems. That testimony is at page 117. He did not alert any of his patients when the label changed. He said that was because, quote, the relative risk that was discussed was actually very small. And just to put that into a bit of context, what he meant when he said the relative risk was very small, the risk of getting a blood clot while taking a birth control pill, any birth control pill, is generally believed to be less than one in a thousand. Even if you increase that risk by two or three times, that's still a very small risk. The risk of getting a blood clot during pregnancy is higher. That data appears in the Baer's label, which is at document 34-5. It was reasonable for Dr. Rowley to conclude that the risk from Baer's, even if higher than other pills, was still very small. It was also reasonable for him to conclude that the benefits of Baer's still outweighed that risk, particularly in patients who had been taking it for a long time without problems. Mrs. Hubbard was just such a patient. By the time of her December 2011 prescription, she had been taking Baer's or pills like it for more than a decade. Now, I'd like to turn to a couple of the points. Before you do, Ms. Swift, let me just ask you one or two questions. This is Judge Marcus. Was Dr. Rowley ever asked unequivocally whether, knowing what he now knows, he still would have prescribed Baer's to Karen Hubbard in December 2011? He was not asked that precise question, Your Honor, but it doesn't make a difference because the questions that I asked him elicited the equivalent of an answer in the hand. He testified that he was aware that there was a slightly higher risk, and he testified that he continued to prescribe it afterwards, particularly to women like Mrs. Hubbard. Let me ask a question this way. Is there any record evidence that he ever met with or counseled Ms. Hubbard since he had seen her in 1996, 15 years before this tragic incident occurred? There is no evidence in the record that he personally met with her, no, Your Honor. What he testified to a number of times in his deposition was that it was, for example, it was the standard practice in his office that she would have received counseling on the risk information about Baer's that had come out before her prescription. All of the published before her December 2011 prescription, and he testified repeatedly that he believed she would have been informed about that information. Did he have any recollection of Hubbard at all? No, he did not, Your Honor. Did he tell us what it is that the nurse who did counsel with Mrs. Hubbard? He did not know what Nurse Kunkel would have told Mrs. Hubbard. He didn't have actual knowledge of that, but let me tell you, Your Honor, what he did testify about how she would have been counseled. He said at page 114 of his transcript, he was asked, you believe you would have shared with Mrs. Hubbard the information about studies showing a possibility of an increased risk of blood clots from Yasmin, which is a related pill. Answer, yes. At page 113, he testified, quote, it was something which the FDA had come out with, but there had been studies before which had also suggested that increased risk, which I think would have been shared with her prior to that even. And then at 112, he testified that it would have been his, quote, his office's, it would have been the office's, quote, standard practice to give Mrs. Hubbard additional information about the risks associated with Diaz if there had been new information since the last time she'd been given a prescription. This is Judge Axson. Let me follow up on a question. You just said that it would be standard for them to sort of update her on Mrs. Hubbard on any risks that they became aware of. And I noted that the FDA had issued a warning in 2011, assuming that the nurse, in this case, followed the standard practice and provided her information regarding that warning. Is there any material difference between the warnings that predate her appointment in December of 2011 and the label change in 2012? No, Your Honor, not that are relevant to the issues in this case. The 2012 label that came after her prescription, if I can summarize it, it's a document 34-5 of the record, the relevant portions of it. It warns of a list of, I believe, 10 studies, many of which were in Bayer's previous label. The new studies that were not in Bayer's previous label, all of those were publicized by the FDA in the updates throughout 2011 that we talk about in our brief. And those updates, sorry, go ahead. I'm sorry, this is Judge Grant, but don't we have to presume for purposes of this decision that the warnings offered by Bayer were inadequate? Yes, Your Honor. The reason that it matters that the information in the 2012 label is the same as the information from prior to that label, the reason that matters is because that prior information that came out from the FDA throughout 2011, Dr. Rowley testified that he knew about that information. So it doesn't go to the adequacy of the label. It goes to Dr. Rowley's actual knowledge of the risks, notwithstanding what the label says. Since we know that Dr. Rowley himself did not counsel the patient, why is it necessarily relevant that he knew of those studies? Wouldn't we need to know whether the nurse who spoke with Ms. Hubbard was aware of those studies? Or that he had counseled the nurse about those studies? Or did the office encourage everyone to know about all the studies and counsel the patient? In this case, at the time under Georgia law, Dr. Rowley had the responsibility and the authority to write the prescription, and so he was the one whose knowledge mattered. My understanding is that later in Georgia, after the relevant time period, nurse practitioners, the law changed, and they were allowed to write prescriptions, but that was not the case at the time of Mrs. Hubbard. Is the counseling dynamic irrelevant? Does it only matter what the prescribing physician was aware of and not what would have been or wouldn't have been counseled to the patient? The counseling is, I believe, irrelevant in this case, Your Honor, but not necessarily for the reason that you're suggesting. The reason that the counseling is irrelevant, well, there's two reasons. One, Dr. Rowley testified unequivocally that his prescribing practices did not change after the label changed, and that the label did not change his assessment of the risks and benefits from BIAS. But two, as I believe, Your Honor, the panel flagged for Mr. Walbert in his argument, Mrs. Hubbard testified unequivocally in her deposition that no matter what the doctor, you know, no matter what the doctor may have said, she followed his recommendations in all cases. And I'd like to read— Oh, Mr. Walbert's point, I would say, is well taken, given the mental deficiencies that I don't think that anyone is disputing. Can we really rely on that in the same way as we would if Ms. Hubbard retained all of her mental faculties? Perhaps not, but I don't think that helps the plaintiff in this case, where it is their burden to come forward with record evidence that creates a fact dispute on causation, and they certainly have not done that with respect to Mrs. Hubbard's testimony, nor did they put in a declaration or anything like that from Mrs. Hubbard or from her husband or anybody else that might have created some kind of fact question that would have made the doctor—Dr. Rowley said his prescribing practices did not change. It was also undisputed that the reason his prescriptions— I'm sorry, Ms. Walbert, I didn't hear you. Thank you. That the reason his prescriptions decreased was because the patients themselves decided not to take B.S. after the label change. We know that Mrs. Hubbard was not that kind of person. When you decide to take a prescription medication, it's because your doctor has recommended it. Answer, correct. The other point on the decrease in the number of prescriptions Dr. Rowley wrote after the label change, there's nothing in the record about whether prescriptions for women like the plaintiff decreased, which is to say Dr. Rowley continued to believe that benefits of B.S. outweighed the risks even after the label change for women who had been taking it a long time without problems. That's at 117 of his deposition transcript, and it was very important to him. At page 17 of his transcript, he made clear that one of the very first things he does—I think he said it was the first thing when he is counseling a patient on birth control—is to ask what they've been taking in the past and whether they're comfortable on it. That's very important because if you've been taking something without problems, it means it's less likely that you're going to have problems going forward. I'm going to return to something you said a moment ago, which is I think there's a dispute between you and the Hubbards about whether the burden of proving proximate cause after an inadequate warning falls on the plaintiff. How do you square your position on that question with the Georgia Supreme Court's holding in McCombs that seems to at least suggest that the learned intermediary doctrine requires an inadequate warning to be operable at all, at least in the state of Georgia? In the McCombs case, the posture of the defendant's motion for summary judgment, Your Honor, was very different in that case. The defendant in that case had raised as a basis for summary judgment the adequacy of the warning. From reading the opinion, I believe that may have been the only issue that the defendant raised. In that context, it made sense for the court to find that in order to resolve summary judgment, they had to determine whether the warning was adequate. That is not the case here. We've said in our briefing, both before this court and the district court, that for purposes of summary judgment, you can presume that the warning is inadequate. It is irrelevant because even if it's inadequate, the plaintiff still has to prove proximate cause. Judge Marcus asked about this during Mr. Wahlberg's argument about whether Dietz, the 2010 11th Circuit case, says anything about a rebuttable presumption. Thank you. May I finish my statement? You may. Thank you. What I wanted to point the court to in Dietz was the statement at page 816 where the court says, in cases where a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action, even with the information the plaintiff contends should have been provided, courts typically conclude that the causal link is broken and the plaintiff cannot recover. It doesn't say rebuttable presumption, but it essentially means the same thing. Of course, in Porter, the court did say there was a rebuttable presumption under Georgia law, and that was affirmed in a per curiam decision. Thank you very much. Before you sit down, Ms. Swift, I just wanted to go a little bit further. Is it your view, then, under Georgia law that there is a rebuttable presumption of proximate cause where the warning is inadequate? Yes, Your Honor. I believe that that is what the Georgia courts would say. The only other case I would point the court to on that point, it's not a case involving prescription medications, but it does address this question about whether you have to think about the adequacy of the label and where the presumptions are. That's the Powell case. In that case, the Georgia appellate court said that they didn't even need to talk about the warning because it was clear from the record that the installer of the catwalk that was alleged to have been deficient didn't even read the instructions. The court said that rendered the warning immaterial. So, if I understand what you're saying, there is a rebuttable presumption where the warning is inadequate. The warning was inadequate. Therefore, the burden of going forward, the burden of production, as we put it, shifted to you, and you met it by virtue of what Rowley said. Do I have it right? You have it right with one caveat. For purposes of this motion, we have said you can presume the warning is inadequate. We do not, as a matter of fact, concede that the warning is inadequate. For purposes of the shifting presumptions, that's right, Your Honor. It's laid out pretty clearly in the Porter District Court case that was affirmed. Thanks very much. Thank you, Your Honor. Thank you. Mr. Walbert, you've got five minutes. Thank you very much, Your Honor. Very quickly, we had a conversation here from Ms. Swift about the FDA warnings in 2011, and they weren't warnings. They were statements of concern and so on. But what did Dr. Rowley actually testify about these? What Ms. Swift lets out is he never saw them. Question. Page 99 of his deposition. Question. Do you recall whether you saw any of these three FDA updates in 2011? Answer. No. He's then shown one by Ms. Swift during the deposition, and he's asked, do you recognize this one from May 31, 2011, one of the FDA three updates? He did not recognize it at all. He then goes on to positively testify in the same part of the cross-examination. He definitely looked at the warning labels that came with the drugs. That's what he relied upon if he says elsewhere in his deposition. We're not experts. We need to rely, that's why we rely in our practice on what the FDA warning label is. Real interesting conversation about the FDA statements, but he never saw them. There's no evidence of that. When he's asked to opine about their significance, what's wrong about that is you're now, Bayer is now trying to convert Dr. Rowley, not into what he would have done under the circumstances, but an expert witness to say that the label had somehow been cured by this, which is contrary to all the expert reports we have about the intentional misstatement and minimization of the danger with regard to those other studies that have been talked about today. Mr. Walker, isn't it a fact that in his deposition he was asked, although I agree with you that Ms. Swift is the person that gave him the 2011 warnings, he said she asked him, and you'll forgive me, I have on my, the transcript I'm looking at, I can't tell what it is, I'm using 58-1 and it's page 113, and she says would it be standard practice to give her the additional information about the risk, and he said if there had been new information since the last time she had given the prescription, yes, and then Ms. Swift asks, and you recall we've seen a variety of safety updates, and he says but they're no different from what had come out in previous studies when they've been talking about maybe a slight increased risk, so it wasn't like an absolute game changer at the time. Correct, and he now, and he testifies that he never even saw them, so he's testifying about what he's heard about, and he testifies, he gets some of the heard and the impression about there's a controversy over the safety. He's never testified, and never says I learned before 2012 that there was a two to three times enhanced risk of clot and stroke. He never had that information, and he's unequivocal in saying that he'd never even seen, he doesn't have any recollection of ever actually seeing the FDA updates, and the one he's says, no, I've never seen that. Only that's remaining? And your honor, another one of the points that Ms. Swift said is that there is the ongoing benefits of taking the drug regardless. Well, what did he really mean by that? First of all, if you look at that testimony, he's talking about what he thought in December of 2011 when he did this prescription. He's not talking about later when he finds out about the enhanced danger and risk of stroke and clotting, because he specifically testifies that he did change his advice after that time. He specifically testifies as well that look at the risk benefit. So we look at what did he mean when he said where the benefits outweigh the risk in patients taking it, what does that mean? Well, he says if you always consider the risk and the benefit, we know as a matter of fact, after the April 2012 warning labels change, that this drug has a significantly higher risk of stroke and clotting than did the previous drugs. No benefit in addition at all for Karen Hubbard by giving bias. So using that testimony of his, you can't possibly interpret the other testimony as meaning he would have done the exact same thing in Karen Hubbard's case, which as counsel concedes, they never asked when she was in this area of cross-examining him. Now... Mr. Walbert, this is Judge Grant. Am I correct in understanding that the warnings were indicated that the product was more dangerous for new patients than for patients... No, no. ...who were taking? No, it was a higher risk period. I mean, the risk is cumulative. The longer you take it, the more chance of a stroke. You know, when she says it's one in a thousand, the question is, if you take it for a month, it's less. If you take it for 10 years, it's more. It's a cumulative probability and there's no loss of danger. There's no hurdle you get over. If you've taken it for five years without a stroke, you're not home. You still have the enhanced risk and there's no evidence that would prove or show to the contrary. So in terms of her, you know, the idea of... What about on one page of the 2012 warning, page 7, USCA 1392, it says, data from large prescriptive cohort safety study of various COCs suggests that this increased risk as compared to those in non-COC users is greatest during the first six months of COC use. Okay. And I'm misunderstanding that that means that the risk is greater during the first six months? I think that there's a particular group of patients that were in that cohort that were studied that had a particularly high risk. But I don't think that means... I think it was the absence of data for later ones is why they made that statement is my understanding of that study. But it doesn't mean in any way, shape or form that there's equal risk to the prior generations of birth control pills after six months or after a year. There's no statement in the warning label to that effect. And there's no evidence to that effect. There may be a lack of proof about somebody that's been on it for 20 years. I mean, it takes 20 years to do that study. So to have a true, randomly controlled study, you literally would have to run it for 20 years. You couldn't have that data for that period of time of having somebody on it and off it. So no, there is no short answer. There is no evidence in the record that would have given a, quote, safe harbor to giving biads to Ms. Hubbard. And again, the drop in prescriptions is proof of that in his practice. When it drops off and he's talking to any patient, he's not saying that today after the April 2012 warning, I continued people on regardless if there was no additional benefit. I mean, it just makes no sense. You give that choice to any patient. You have an enhanced risk here. You have no additional benefit. Would you like to have the enhanced risk of a clot and a stroke? No. Not only can we argue that to the jury, but that's the inevitable consequence of his practice. I would just submit, Your Honors, in closing that that evidence is something that for the and any of this evidence we've talked about today, we would submit precludes summary judgment. They can argue it to a jury and that's what should have happened in this case. And if there's no further questions from the panel members. Thank you, Mr. Robert. We appreciate your argument and that of all of the counsel who helped us with these cases today. We are adjourned. Thank you very much, Your Honor.